## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NINFA RUIZ and RODRIGO JARDON AYALA | § § § | |
| **Plaintiff,** | § § | Civil Action No. |
| VS. | § § | 5:21-cv-855 |
| CITY OF SAN ANTONIO, TEXAS; AND JOE CASTANEDA | § § § | |
| **Defendants.** | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Plaintiffs and file this lawsuit for violation of their civil rights, in support of which would respectfully show the Court the following.

### I. JURISDICTION AND VENUE

1.     Plaintiffs bring this action under the U.S. Constitution and 42 U.S.C. §1983. Jurisdiction is based on 28 U.S.C.  §§1331, 1343(a)(3)-(4).

2.     Venue is proper in this Court under 28 U.S.C. §1391(b)(1)-(2) as the county in which all or part of the cause of action arose.

### II. PARTIES

3.     Plaintiffs are residents of Bexar County, Texas.

4.     At all relevant times, the Defendant officer acted as an agent and employee of the City of San Antonio under color of law. As such, he was responsible for upholding the laws of the

United States and Texas.  He may be served at the San Antonio Police Department,  315 S. Santa Rosa Ave., San Antonio, TX  78207.

5.      Defendant City of San Antonio, may be served through its Mayor Ron Nirenberg or its Secretary, both located at City Hall, 100 Military Plaza, San Antonio, TX  78205.

### III. STATEMENT OF FACTS

6.      This case arises out of excessive force and wrongful arrests of Plaintiffs on October 3, 2019.

7.      Plaintiffs were owners and operators of a restaurant/bar in San Antonio called Garden Bistro Bar.  On October 3, 2019, Plaintiffs, in accordance with the Texas Alcohol and Beverage Code ("TABC"), discontinued serving alcohol at 2 a.m., collected all alcohol containers and closed the establishment to the public.  However, Plaintiffs (the owners of the bistro) and a few others remained on the premises socializing and drinking non-alcoholic beverages, which is not prohibited under the TABC or any other law.  It was Mr. Jardon-Ayala's birthday and they were celebrating with some cupcakes brought by an employee.  Some of the employees were in the process of cleaning the establishment to prepare for business the next day.

8.      At approximately 2:40 a.m., Defendant Castaneda parked his police vehicle next to the concrete half-wall that surrounds the establishment's patio area.  Defendant Castaneda began screaming at the individuals on the patio that they needed to get the "f#$%" back into the establishment.  Mr. Jardon-Ayala pointed out that no one was drinking alcohol and thus, were not prohibited from being there by any TABC rules.  Defendant Castaneda became upset by that response, said "oh, yeah?" and got out of his vehicle.

9.      After Castaneda exited his vehicle, Plaintiffs left the patio area and went inside the establishment.  Ms. Ruiz went inside near the entry to the kitchen area and Mr. Jardon Ayala

went into the office.   Defendant Castaneda jumped over the half wall and entered the establishment.

10.     Defendant Castaneda began confronting the people inside asking aggressively "where's that guy that was talking shit?  He leave already?"  Defendant Castaneda walked to the front of the establishment, opened the door and shined his flashlight on several people outside, asking "where's that guy at?  He was talking smack."  He continued to ask about the location of the individual that was "talking smack."

11.     Defendant Castaneda then turned and confronted individuals inside the establishment, instructing them that they had to start leaving or else he would have "TCBA come out here and start writing tickets."   One or more of those individuals tried to explain that Defendant Castaneda's statements were inaccurate because the TCBA only required them to stop serving/consuming alcohol, not to leave.    In response, Defendant Castaneda began to try and arrest the person informing him of the applicable rules.

12.     Defendant Castaneda then began yelling at the individuals in the establishment to "GET EM OUT!" and "LET'S GO!"  He continued to instruct people that they must leave.

13.     Defendant Castaneda continued to walk through the establishment until he encountered Plaintiff Nina Ruiz.  As an example of excessive force, Castaneda immediately began to grab her arm and, upon information and belief, intentionally turned off his body camera in violation of SAPD policies.  Ms. Ruiz pulled away and Defendant Castaneda then grabbed her other arm and shoved her against the wall, causing Ms. Ruiz to fall onto her buttocks.  Ms. Ruiz was helped up by an employee after which she sat on a bar stool, experiencing pain in her buttocks and her arm. Ms. Ruiz sat on the bar stool watching but quietly.  She did not make any threats, posed no threat of harm, took no threatening action and was not breaking any laws or committing any crime.

14.     Shortly thereafter, Defendant Castaneda returned to where Ms. Ruiz was sitting on the barstool, grabbed her leg and yanked her violently off the barstool, throwing her crashing to the ground onto her stomach.   The impact cracked Ms. Ruiz's jaw, caused severe pain in her abdomen (she was recovering from a C section from the birth of her child) and broke her hand. Defendant Castaneda placed a knee in Ms. Ruiz's back, putting all of his weight onto her and causing further pain and injury.  All instances of excessive and illegal force.

15.     Mr. Jardon-Ayala, fearing for his wife's life, begged Castaneda to let her go, yelling that she was recovering from surgery.   Realizing that Defendant Castaneda was ignoring his pleas, and fearing further harm to his wife, Mr. Jardon-Ayala pulled Defendant Castaneda off of Ms. Ruiz.  Defendant Castaneda then threw Mr. Jardon-Ayala to the ground and began choking him, placing all of his weight on top of Mr. Jardon-Ayala and his forearm across Mr. Jardon-Ayala's neck.  Mr. Jardon-Ayala did not resist and pleaded with Castaneda to arrest him so that would end the choking and the ordeal.  Mr. Jardon-Ayala put both arms out, stating that he was not resisting and repeating "arrest me," but Defendant Castaneda would not get off of him or stop choking him.  Mr. Jardon-Ayala believed that he was going to be killed by Defendant Castaneda. Eventually, other SAPD officers arrived and Defendant Castaneda finally stopped choking Mr. Jardon-Ayala.  Both Plaintiffs were arrested at the scene.

16.     Defendant Castaneda misrepresented facts to the other officers that arrived at the scene and in his official report, falsely claiming that the individuals in the establishment claimed that the TABC rules did not apply to them, falsely claiming that alcohol was being consumed at the time, falsely claiming that Ms. Ruiz was leaning on a wall and kicked him in his stomach which caused him to grab her leg and her to lose her balance and fall to the floor.  Cell phone video clearly shows Defendant Castaneda grabbing Ms. Ruiz's foot while she was seated on a stool and

swinging her violently to the ground.  Defendant Castaneda violated the SAPD rules regarding warrantless entry, use of force and arrest.

17.    Both Ms. Ruiz and Mr. Jardon-Ayala suffered physical injury and substantial emotional trauma from the ordeal, including Post Traumatic Stress Disorder.  Both suffer from flashbacks, mood swings, nightmares, avoidance, and anxiety.  Ms. Ruiz continues to experience an irregular jaw and impairment from the damage to her hand.

## IV. CAUSES OF ACTION

18.    Paragraphs 6—17 above are hereby incorporated into these counts of Plaintiffs' Complaint.

19.    Plaintiffs' rights were violated in contravention of the Fourth Amendment of the United States Constitution.  Plaintiffs suffered severe, disabling and permanent injuries as a result of the unconstitutional actions of Defendants.

A.    THE INDIVIDUAL OFFICER

20.    Plaintiffs sue Defendant Castaneda under 42 U.S.C. § 1983 for violations of Plaintiffs' Fourth Amendment rights in that a) he employed unnecessary, unjustified and excessive force and restrained Plaintiffs' liberty; and b) he unlawfully arrested Plaintiffs.

21.    "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Pena v. City of Rio Grande City, Texas*, 816 F. App'x 966, 969 (5th Cir. 2020), citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  What is examined is "the relationship between the need and the amount of force used." *See Gomez v. Chandler,* 163 F.3d 921, 923 (5th Cir.1999); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a

careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting *Garner*, 471 U.S. at 8, 105 S.Ct. 1694). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them...." *Id.* at 397, 109 S.Ct. 1865. In determining whether the use of force is reasonable, we must assess the totality of the circumstances, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865; <u>Pena</u>, 816 F. App'x at 970.

22.     Under the first factor set out in *Graham*, it is clear that the Plaintiffs had committed no crime.  They were not serving or consuming alcohol at the time of the encounter with Defendant Castaneda.  Thus, there should have been no force employed.   *See Pena v. City of Rio Grande City, Texas*, 816 F. App'x 966, 971 (5th Cir. 2020); *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017); *see also Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010).

23.     Under the second factor set out in *Graham*, Plaintiffs posed no threat to the safety of the officers or others and had made no threats to or about anyone.

24.     Under the third factor set out in *Graham*, Plaintiff Ruiz was sitting on a stool when Defendant Castaneda approached her and, without warning, grabbed her foot and swung her off of the stool and crashing to the floor.   While Ruiz had earlier pulled away from Defendant Castaneda, he was not in the process of arresting her at that time and she had committed no crime.  Under those circumstances, there was no use of force justified.   *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (plaintiff pulling arm away from an officer after the officer grabbed the plaintiff's arm was only minimal resistance, if at all, and did not

justify use of force); *Pena*, 816 F. App'x at 973 (passive or minimal resistance does not justify force used); *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017)(pulling arm away did not justify force used).  At the time that Defendant Castaneda attacked Ruiz, she was not pulling away or taking any physical action against Castaneda.

25.     The third factor in *Graham* also weighs in favor of Plaintiff Jardon-Ayala.  Under Tex. Penal Code Ann. § 9.31:

> (c) The use of force to resist an arrest or search is justified:
> (1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and
> (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.

A "reasonable belief" is not whatever the actor believed; rather, according to the statute, it is "a belief that would be held by an ordinary and prudent man in the same circumstances." TEX. PENAL CODE 1.07(42). In this context, the term "ordinary and prudent man" means "ordinary and prudent person." *See Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010); *Bell v. State*, 566 S.W.3d 398, 402 (Tex. App.—Houston [14th Dist.] 2018, no pet.). In the instant case, Plaintiff Jardon-Ayala observed Defendant Castaneda using excessive force in his violent attack on Ruiz, Ayala's wife.  He saw Castaneda fling Ruiz to the ground where she landed on her stomach and Ayala knew that she had recently undergone surgery for a C-section and still had stitches in her stomach.  Ayala observed Castaneda put all of his weight on the back of Ruiz and grab her arms.  Ayala, seeing the excessive force and reasonably believing that he needed to use force against Castaneda to protect Ruiz, acted with the minimum amount of force necessary.  When he had pulled Castaneda off of Ruiz, Ayala attempted to "surrender" to Castaneda, who ignored Ayala's pleas and remained on top of Ayala, choking him, until other

officers arrived.  Thus, Plaintiff Jardon-Ayala also meets the third *Graham* factor in the claim against Defendant Castaneda.

26.    In assessing a claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "A court (judge or jury) cannot apply this standard mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). Rather, the inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff 's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466.  *Lombardo v. City of St. Louis, Missouri*, No. 20-391, 2021 WL 2637856, at *1 (U.S. June 28, 2021).  Applying the *Kingsley* factors, there was no need for any force at all—much less the amount of force used; the injuries to Plaintiffs were severe and permanent; there was no effort by Defendant Castaneda to temper or limit the force used; there was no security problem at issue because Plaintiffs had committed no crime, had not threatened anyone and were not holding or pointing a weapon; there was no immediate threat that could have been reasonably perceived by the officer.  The speed with which an officer resorts to force, *Trammell*, 868 F.3d at 342, and the failure of the officer "to use physical skill, negotiation, or even commands" before applying such force, *Newman v. Guedry*, 703 F.3d 757, 762 (5th Cir. 2012), weigh in favor of finding that the use of force was excessive to the need.  *Pena*, 816 F. App'x at 973.

27.    For a right to be clearly established at the time, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The central concept [of the test] is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004)(quoting *Hope v. Pelzer,* 536 U.S. 730, 740 (2002)).  *Flores v. City of Palacios*, 381 F.3d 391, 399–400 (5th Cir. 2004.  The parameters of "excessive force" have been established at the very least since *Graham v. Connor* in 1989.  Indeed, that case is taught in police academies for the officers to learn how to gauge the need for force in a given situation.  Certainly, the right to be free from any force when there has been no crime committed was clearly established and known to Defendant Castaneda at the time.

28.    Should Defendant Castaneda offer a competing narrative regarding the events, it will be up to a jury to resolve any factual disputes.  As the Fifth Circuit noted in its *en banc* opinion in *Cole v. Carson*, 935 F.3d 444, 447 (5th Cir. 2019) (*en banc*): "We conclude that it will be for a jury, and not judges, to resolve the competing factual narratives as detailed in the district court opinion and the record as to the ... excessive-force claim."

29.    The actions were objectively unreasonable and no officer under the circumstances would have used force and/or excessive force and/or arrested Plaintiffs .

30.    Defendant Castaneda entered the premises without a warrant and without exigent circumstances.  There is no doubt that it was clearly established in August 2005 that "[a]n arrest is unlawful unless it is supported by probable cause." *Deville v. Marcantel*, 567 F.3d 156, 166

(5th Cir. 2009), citing *Flores v. City of Palacios,* 381 F.3d 391, 402 (5th Cir.2004); *see Blackwell v. Barton,* 34 F.3d 298, 303 (5th Cir.1994). The arresting officer's state of mind is irrelevant to the existence of probable cause. See *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). In the instant case, the Plaintiffs were not violating any laws, committing any crime or threatening to do so.

31.   Plaintiffs were charged with assault on a peace officer, interference with the duties of a public servant, and selling/consuming alcohol during hours prohibited by the Alcoholic Beverage Code. All charges assessed against the Plaintiffs as a result of this incident were dismissed on April 9, 2021 for the reason "unable to prove beyond a reasonable doubt."

B.   CITY OF SAN ANTONIO

32.   A municipality is liable if it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Harper v. McAndrews*, 499 F. Supp. 3d 312, 320 (E.D. Tex. 2020) A single incident of unconstitutional activity will not suffice to hold a municipality liable unless a plaintiff establishes that it was caused by an existing unconstitutional "official policy." *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989). Official policy is either an officially adopted policy or a widespread practice so common as to constitute a custom that fairly represents municipal policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1985). A single incident of a violation "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

1.      Absence of Policy

33.     The absence of a policy can be the basis for municipal liability if such absence was the moving force behind a constitutional violation.  *Harper v. McAndrews*, 499 F. Supp. 3d 312, 324 (E.D. Tex. 2020).  In *Harper*, it was determined that a reasonable jury could find that the absence of a policy requiring two officers to respond to a call for a welfare check was the moving force behind the death of the decedent.  In the case *sub judice*, the City failed to have policies adequately addressing the application of TABC rules and/or a warrantless entry into an establishment without probable cause.  While the City has a policy (Procedure 502) stating that a violation of the Alcohol Beverage Code provides a basis for a warrantless search and/or arrest with probable cause, it has no policies defining, explaining or distinguishing a violation of the TABC versus non-violating conduct or the circumstances in which an officer may not conduct a warrantless search or arrest under TABC rules.

34.     The San Antonio Chief of Police is the "policymaker" with respect to General Orders applicable to officers enforcing TABC rules and/or a warrantless entry into an establishment without probable cause.

35.     The San Antonio Police Department's policies and procedures are outlined in a General Manual.  "The General Manual is published and issued under the authority of the Chief of Police and has the effect of an order."  Pursuant to Chapter 143 of the Local Government Code, as amended, the Chief of the San Antonio Police Department shall have the power to take disciplinary action or suspend indefinitely an officer under his supervision for violation of either Chapter 143 of the Local Government Code, the Civil Service Rules of the City of San Antonio, or of these rules and regulations. In addition, the Chief of Police shall be empowered to take

disciplinary action or suspend indefinitely any other police employee for violation of these rules and regulations.

36.     Thus, the policymaker with respect to the General Manual governing use of force and/or arrests is the San Antonio Chief of Police.  Each of the lawsuits and claims listed below were reported to both the Chief of Police and to the City Manager.  The relevant policymaker was aware of the need for additional training and policies addressing the use of force and arrests and made a deliberate decision not to promulgate such a policy or provide training to officers in that regard.

        2.     Inadequate Training/Supervision

37.     For an inadequate training claim, Plaintiffs must establish (1) an inadequate training policy; (2) deliberate indifference in adopting the training policy; and (3) that the inadequate training policy directly caused the Plaintiff's injury. *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992). Deliberate indifference in adopting the training policy is found  when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  *Harper*, 499 F. Supp. 3d at 320–21.

38.     Under the circumstances presented, it is highly predictable that a failure to properly train officers on the application of the TABC, particularly with respect to warrantless searches and/or arrests, would result in a constitutional deprivation.  It is extremely obvious from the various videos of the events that Defendant Castaneda had no training at all with respect to application of the TABC rules and that led directly to an illegal entry, search and ultimately to his use of excessive force and unlawful arrest.  Defendant Castaneda was never trained that while the

TABC requires the discontinuance of service/consumption of alcohol at 2 a.m., it does not require vacating the premises.  He can be heard continuously asserting that the TABC required that everyone vacate the premises and that he was going to call them out to "start writing tickets if everyone didn't leave immediately."  If he had proper training, he would not have attacked and arrested the Plaintiffs, who were neither serving nor consuming alcohol at the time.  The SAPD procedures allow for warrantless search and arrest for violations of the TABC, so the failure of the SAPD to provide appropriate training on this issue amounts to deliberate indifference.

39.     Additionally, upon information and belief, Defendant Castaneda had a history of using excessive force prior to the incident with Plaintiffs of which the SAPD was aware.  Such history should have, at the very least, put the City on notice that Defendant Castaneda was in need of additional or different training regarding the use of force, particularly in situations involving a warrantless detention or arrest.

        3.     Pattern

40.     There has long been a pattern of instances of encounters between San Antonio police officers and purported detainees resulting in injury to the detainee from unnecessary and excessive force.   Despite this pattern, the City failed to adopt policies or provide training to its officers with respect to unjustified excessive force.

41.     From 2016 through 2020, SAPD had 740 "Formal" complaints against officers. A "Formal" complaint "is a complaint on an officer for conduct that exhibits a significant variance from behavioral expectations established through formal training, departmental rules, regulations, policies, or procedures which regulate an officer's conduct."  Use of force is the third most frequent of such complaints.  From 2016 through 2020, SAPD recorded 3,341 use of force incidents.  However, after 2016, these do NOT include "take-downs" such as were used on

Plaintiffs in the instant case.  Thus, the number of instances of use of force to include take-downs would be substantially higher.

42.     Additionally, there have been numerous lawsuits filed against the City and officers for unjustified and/or excessive use of force over the past ten years.

43.     *Ramirez v. Joe Castaneda and City of San Antonio*.  March 3, 2012.  Mr. Ramirez and his friends were lawfully in a motel room.  Police officers, <u>including Joe Castaneda</u>,  entered the room.  Defendant Castaneda asked Mr. Ramirez for his i.d. and Mr. Ramirez stated that he did not have i.d.  In response, Castaneda unjustifiably and violently threw Mr. Ramirez headfirst into a wall, causing serious injury.

44.     *Jesse Mendez v. City of San Antonio*.  July 5, 2007.  Officers pulled over a taxicab in which Mr. Mendez was a passenger.  The officers asked Mr. Mendez to step out.  Mr. Mendez was scared and started to run.  The officers caught him, handcuffed him and then, while he was handcuffed, brutally beat him, causing serious physical injury.

45.     *Juan Castillo v. City of San Antonio*.  August 9, 2010.  Mr. Castillo was shot in the back by San Antonio officers while trying to distance himself from an altercation between the officer and another person.

46.     *Raul Aleman v. City of San Antonio*.  September 11, 2009.  Mr. Aleman was unjustiably beaten by officer during his arrest until he was unconscious, suffering serious physical injury.

47.     *Ricardo Cardenas v. City of San Antonio*.  May 12, 2009.  Mr. Cardenas was on his way to work, when he realized he had forgotten his lunch and turned around to go back home.  He was pulled over by San Antonio police without cause.  He was taken into custody and a group of officers unnecessarily and without cause punched, kicked, kneed and choked Mr. Cardenas while driving him face down into the dirt and gravel, causing substantial physical injury.

48.    *Robert Valle v. City of San Antonio*.  December 8, 2009.  After a car chase, Mr. Valle was pulled over and his car was on fire.  A San Antonio officer broke his window with a nightstick, unjustifiably and unnecessarily hit him numerous times with the nightstick, pulled him out of the car and beat him until he could not see.

49.    *Tyrone Ross v. City of San Antonio*.  January 29, 2010.  Mr. Ross was walking home when he was detained by San Antonio police for not walking on the sidewalk.  He was unjustifiably and unnecessarily hit repeatedly in the head with a baton, causing significant physical injury.

50.    *Gregory Beversdorf v. San Antonio police officers*.  March 5, 2012.  Mr. Beversdorf was severely beaten with a baton and tased by San Antonio police officers unjustifiably and without cause.

51.    *Tony Love v. City of San Antonio*. April 2, 2012.  Mr. Love was walking down the street, not committing any crime, when an officer in an unmarked car ordered him to approach and place his hands on the hood of the car.  Mr. Love did not comply and the officer punched him in the face.  Mr. Love tried to flee and the officers tackled him, choked him and pepper sprayed him as well as beat him with a baton.  The officer that handcuffed him, said "tase his black ass" and he was tased without cause.

52.    *Irma Aragon v. City of San Antonio*.  July 27, 2014.  San Antonio police officer confronted the deceased at the officer's girlfriend's house and, without legal justification chased deceased to his house and shot and killed him.

53.    *Ramon Sandoval v. City of San Antonio*.  April 21, 2014.  Mr. Sandoval and a friend were at a hotel and went to complain to management about some chicken wings.  The manager called

the police who kicked Mr. Sandoval to the ground, cuffed him and pulled him to the car by his nose.  Mr. Sandoval was not resisting, not threatening anyone and not breaking any laws.

54.    *Venancio Enriquez v. City of San Antonio.*  January 9, 2014. San Antonio officers burst into Mr. Enriquez's apartment and, without justification or cause, began hitting him in the head and stomach.

55.    *Tawayne Malone v. City of San Antonio.*  July 14, 2015.  Mr. Malone was severely beaten by a San Antonio officer during a normal traffic stop, during which Mr. Malone did not present a threat to the officer or the public.

56.    *Raycheal Piper v. San Antonio police officer*.  September 3, 2015.  Ms. Piper was arrested for DUI.  Without provocation or cause, the arresting officer slammed her against the vehicle, pepper sprayed her, threw her to the ground and smashed her face into the ground.

57.    *Rogelio Carlos v. City of San Antonio*.  March 10, 2016.  Mr. Carlos was looking at a building site.  San Antonio officers rushed him, began punching and kicking him.  The officers, without cause, forced Ms. Carlos to lie face down in the dirt and handcuffed him, before realizing he was not a suspect.

58.    *Travis Cobb v. City of San Antonio*.  July 21, 2016.  Mr. Cobb was approached by San Antonio officers and, without cause or provocation, was thrown down the stairs by the officers who then stepped on his face and neck.

59.    *Sidney Gates v. City of San Antonio*.  March 21, 2018.  Mr. Gates was at a mental hospital.  He was holding a pencil.  San Antonio officers were dropping off a patient when there was a scream.  The officers pointed their guns at Mr. Gates and told him to drop the pencil.  Mr. Gates, being terrified, screamed and was shot by an officer.

60.   *Taras Kerr v. City of San Antonio*.  October 29, 2018.  Mr. Kerr was being chased by San Antonio police.  He was instructed to freeze.  He froze and put his hands in the air, yet was shot and tased by the officers after he had obeyed commands and had his hands in the air.

61.   *Natalie Simms v. City of San Antonio*.  2018.  Ms. Simms was illegally searched without probable cause, had her shorts and underwear pulled down by officers while on the street in view of numerous officers and the public and her tampon pulled out and held up for inspection.

62.   Plaintiffs have listed many instances where San Antonio officers used excessive and unjustified force.   Plaintiffs assert that there are other—perhaps many other—instances of such conduct as reflected in media reports and the City's documents and would seek permission from the Court to conduct discovery against the City to ascertain all other instances/complaints of excessive and unjustified force.  However, even without additional instances of such conduct, there is a sufficient pattern to establish a claim for the failure of the San Antonio police to train officers and/or establish necessary policies.

63.   As a result of Defendants' actions and omissions described, Plaintiffs have suffered extreme pain and anguish.  Defendants' acts, omissions, policies, procedures and/or customs as set forth above are the proximate cause of substantial damages to Plaintiffs, including severe pain and suffering, both emotional and physical.

64.   Defendants' conduct has violated the Fourth amendment to the United States Constitution.  Plaintiffs are entitled to recover physical pain and mental anguish in the past and future, economic damages in the past and future, medical expenses in the past and future, compensatory damages in the past and future, attorneys' fees, costs, litigation expenses, and expert fees, as allowed, as well as pre-judgment and post judgment interest as allowed by law, pursuant to 42 U.S.C. §1988, 12205.

## V. JOINT AND SEVERAL LIABILTY

65.     Defendants are jointly and severally liable.

## VI. DEMAND FOR JURY

66.     Plaintiffs request a trial by jury.

## CONCLUSION AND PRAYER

THEREFORE, Plaintiffs pray for judgment against Defendants for actual and compensatory damages, declaratory relief, and for statutory attorneys' fees, costs, and expenses, punitive damages against the individual Defendant and pre-judgment and post judgment interest. Finally, they seeks all other additional relief as the Court deems just and proper.

Respectfully submitted,

s/Susan E. Hutchison
Susan E.  Hutchison
Texas Bar No. 10354100
sehservice@FightsforRight.com

s/ S. Rafe Foreman
Texas Bar No. 07255200
srfservice@fightsforright.com

HUTCHISON & FOREMAN, PLLC
505 Pecan St., Ste. 102
Fort Worth, TX  76102
(817) 336-5533
817.887.5471 fax

ATTORNEYS FOR PLAINTIFFS